### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-108 (TSC)** |
| **v.** | : | |
| | : | |
| **MICHAEL JOHN DILLON,** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Michael John Dillon to three months' incarceration (a sentence at the mid-point of the Guidelines range) followed by 12 months of supervised release. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

### I.     Introduction

Defendant Michael John Dillon participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Shortly before trial was scheduled to begin, Dillon pleaded guilty to violating 18 U.S.C. § 1752(a)(1).  Dillon watched the mob assault and overrun police defending the Senate Wing Door for almost fifteen minutes before climbing through a broken window himself.  Dillon has since told brazen and evident lies about his conduct and his motivations on January 6 to the government and the Court.  Dillon's enthusiastic participation on the front lines of a violent breach, coupled with his duplicity and notable remorselessness, justify the government's recommendation here.

 The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Dillon's crime support a sentence of three months' incarceration, 12 months' supervised release, 60 hours community service, and $500 restitution in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF No. 66 (Statement of Offense) at 1–3.

### Defendant Dillon's Role in the January 6, 2021 Attack on the Capitol

Dillon, a 69-year old man from Fort Myers, Florida, made plans with his friend to travel to Washington, D.C. to attend the former President's "Stop the Steal" rally and show support for the former President.   A group—coordinated by the friend—of seven people sharing two cars, caravanned up from Southwest Florida and arrived in Virginia early in the morning on January 6,

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

2021.  After resting a few hours, the group took the train into D.C.  That day, Dillon was wearing a camouflage-colored baseball hat with the words "Trump 2020," a black leather jacket, and at times, he carried a cane and a flag.  *See* Image 1.



*Image 1: Dillon (circled) in Washington on January 6, 2021, wearing a backpack, a camouflage-colored baseball hat with the words "Trump 2020," a black leather jacket, and carrying a cane.*

At the rally, Dillon listened to speakers from near the Washington Monument, including former President Trump's speech.  *See* Image 2.  After the rally, at least two members of the group—Dillon and an unidentified companion—walked along Constitution Avenue towards the restricted Capitol Grounds.



*Image 2: Dillon (circled) listened to speeches on January 6, 2021 near the Washington Monument while holding a flag*

Dillon arrived at the Upper West Terrace, which had been overrun by the mob, at approximately 2:32 p.m.  *See* Image 3.  As Dillon approached, a rioter was scaling the wall above the Senate Wing Door.  Despite the numerous warning signs, Dillon proceeded ahead nonetheless.



*Image 3: Dillon (circled) approached the Senate Wing Door from the Upper West Terrace at 2:33 pm, as a rioter climbed the wall above the door*

Minutes later, at 2:36 p.m., tear gas was deployed where the rioters stood outside the Senate Wing Door—which Dillon saw.   ECF No. 66 (SOO) at ¶ 12.   At 2:37 p.m., as the smoke cleared, Dillon approached the broken window to one side of the Senate Wing Door and began speaking to U.S. Capitol Police officers guarding the other side.  *See* Image 4.   Dillon heard the mob repeat chants of "Fight for Trump!", "Our House!", and "USA!"  *See* Sentencing Exhibit 1 at 4:40, 5:00, 7:00.



*Image 4: Shortly after tear gas was deployed against rioters, Dillon (circled) approached and spoke to U.S. Capitol Police officers guarding the Senate Wing Door*

As seen above, police had barricaded the Senate Wing Door itself, which had been earlier breached, to prevent more rioters from storming the Capitol.  At approximately 2:42 p.m., rioters at the door began violently attempting to breach the door.  Dillon stood feet away, just by the broken window.  *See* Image 5; Sent'g Ex. 1 at 7:15–8:15.  An alarm was also audibly ringing.



*Image 5: Dillon (circled) was present as rioters attempted to open the Senate Wing Door and an alarm sounded*

At 2:47 p.m., rioters, using flagpoles, fists, and their bodyweight, resumed their assault, and forced their way through the line of officers defending the Senate Wing Door. Sent'g Ex. 1 at 12:40. Dillon, who had been standing by the broken window moments before, knew that the mob had pushed into the building by force. *See* Images 7, 8.



*Image 7: Dillon (circled) again at the window, moments before rioters overcame the U.S. Capitol Police officers defending the barricaded Senate Wing Door*



*Image 8: Members of the mob began a successful violent assault to overcome officers at the Door, resulting in the second breach of the Senate Wing Door*

At approximately 2:50 p.m., following immediately after other rioters, Dillon entered the

Capitol by climbing through the broken window to one side of the door.  *See* Image 9; Sent'g Ex.

1 at 15:00.   Dillon's entry followed the thirteen minutes he stood by the window, from which vantage point he watched the mob breach the Senate Wing Door for the second time on January 6. By the time he entered, police inside were completely outnumbered by the mob.



*Image 9: Dillon (circled) climbed through the broken window next to the Senate Wing Door*

Dillon remained in the crowd near the Senate Wing Door for several minutes.   While inside, Dillon again talked to a U.S. Capitol Police officer, who was clearly outnumbered by the rioters. Sent'g Ex. 1 at 15:30.   Dillon was present as the crowd inside chanted "Whose House, Our House!", and joined the crowd's chants of, "USA! USA!"   *See* Sent'g Ex. 1 at 16:10, 17:20.   At approximately 2:55 p.m., Dillon left the Capitol building through the Senate Wing Door.   *See* Image 10.   In total, Dillon spent approximately five minutes in the Capitol Building.



*Image 10: Dillon (circled) left the Capitol through the Senate Wing Door at 2:55 p.m*

After he left the Building, Dillon joined the mob's rendition of the "Star-Spangled Banner" on the Upper West Terrace.  Instead of leaving Capitol grounds, Dillon then headed north, where he rejoined his companion by the North Door.  *See* Image 11 below.



*Image 11: Dillon (circled) rejoined his companion near the North Door (approx. 1:10 of GX 514)*

At some point, Dillon and his companion left Capitol grounds, rejoined the group, and caravanned back to Southwest Florida.

*Defendant's Interview*

On February 5, 2021, the FBI interviewed Dillon at his residence in Fort Myers, Florida. Dillon admitted that he was at the Capitol on January 6, 2021 and said he was there to support the President, but he did not hurt anyone or damage any property. Dillon declined to answer further questions, including how he traveled or whether he went inside the Capitol Building. Dillon declined to be interviewed after his arrest on February 13, 2023.

*The Charges, Plea Agreement, and Plea Colloquy*

On April 4, 2023, the United States charged Dillon by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1), (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On December 19, 2023, pursuant to a plea agreement, Dillon pleaded guilty to Count One of the Information,

charging him with violating 18 U.S.C. § 1752(a)(1).  By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

During his plea colloquy before this Court, Dillon hedged on the crucial question of whether he was pleading guilty because he was, in fact, guilty: "Uh, yes, I guess.  Yes, Your Honor."  Plea Hrg. Tr. 19.  Dillon then told this Court that only reason he had gone into the Capitol was to protect a police officer:

> I'd just like to say, when I entered the Capitol there was a police officer at the window very scared and he looked pretty crazy. I told the police officer, I said, look, I'm not here for violence and I'll stand between you and anybody that tries to do anything against you. And that's the only reason I went into the Capitol. I am guilty of going into the Capitol, Your Honor. I went to the—I stood there and as soon as everybody went the other way, I left.

Plea Hrg. Tr. 20-21.  This is a *post hoc* fabrication, no more and no less.  The evidence shows that Dillon in fact joined the mob shouting at police officers from the broken window, that rioters mere feet away from him violently assaulted police and overran the barricaded door, and that Dillon joined the mob's chants once inside.  There is no evidence—none—that Dillon sought to protect officers.  In short, Dillon lied to this Court under oath.

### The Post-Plea Debrief

On January 22, 2024, pursuant to the plea agreement,[2] the government conducted a virtual debrief interview of Dillon in the presence of his counsel.  At the outset of the interview, the undersigned explained to Dillon the purpose of the interview and reminded Dillon of his obligation to be truthful.  Although Dillon admitted to the broad strokes of his January 6 conduct—the

---

[2] In paragraph 2 of the plea agreement, Dillon agreed to interview "regarding the events on and around January 6, 2021 prior to sentencing," which includes Dillon's conduct and others whose conduct he may know about.  ECF No. 65 at 2.

conduct he'd already pled guilty to—Dillon declined to identify his companions and made several demonstrably false statements.[3]

Dillon explained that he had traveled to Washington, DC with others to show support for the former President by attending the "Stop the Steal" rally at the Ellipse. Dillon declined to identify the individuals with whom he traveled. Dillon also falsely stated he did not carry a flag—then blamed a bad memory when asked why a photograph might show him carrying one.

Dillon claimed that he walked to the Capitol grounds because President Trump had told him to. Dillon declined to identify the following individual that Dillon walked with from the Ellipse to Capitol grounds:



*Image 12: Dillon declined to identify the individual next to him (yellow square)*

---

[3] While Dillon shoulders sole responsibility for his own false statements, the Government notes that defense counsel repeatedly attempted to frustrate the purpose of the debrief, including by improperly interjecting about "problems with the 2020 Election" and calling the undersigned's statement that the Government would document Dillon's lack of cooperation in its sentencing memo "threatening."

When he got to Capitol Grounds, Dillon said he did not remember seeing any barricades, but did recall seeing tear gas.  Dillon admitted to going through the scaffolding to reach the Upper West Terrace.  When asked about his conduct at the Senate Wing Door, Dillon offered his most brazen and incredible lies about his conduct.  In particular:

First, Dillon stated that he did not see violence against law enforcement.  This was false, since Dillon was within feet of the mob that overran police at the Senate Wing Door by force and experienced tear gas deployed near rioters.

Second, Dillon claimed he was let into the Senate Wing Door by the police.  There is not a shred of evidence to support this—as described, after the mob overran police, Dillon (and many other rioters) climbed through the broken window next to the Senate Wing Door while an alarm blared.

Third, and finally, Dillon claimed that he went inside the building to "stand between" the rioters and law enforcement, to make sure "nobody tried to hurt the officers" and to "protect against Antifa."  Once inside, Dillon did nothing of the sort.  Dillon had earlier insinuated that he believed Antifa was present, claiming to have seen "a guy with a 2x4 punch the window, he was also wearing a helmet and was not peaceful."  Dillon witnessed the mob overpower officers at the Senate Wing Door, climbed through the window, and as described below, joined chants inside.  His fabricated justification that he entered the building to protect police officers is not remotely plausible.

Dillon admitted to chanting "do your job" while inside.   When pressed on what that chant meant, Dillon's explanation was vague—it was "for anyone that's not doing their job," that someone in the building had said that Pence had certified the election, and that there could be

injustice.  Dillon said that he left the Capitol Building because he didn't want to be inside anymore and there was no threat (presumably, to the officers Dillon was claiming to protect).

### III.  Statutory Penalties

Dillon now faces sentencing for violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year imprisonment and a fine of up to $100,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.  The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.*

The Government agrees with the PSR's calculation of the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)(vii)) | +2 |
| Zero-Point Offender (U.S.S.G. § 4C1.1) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR ¶¶ 37–46.

As correctly noted in the PSR, Dillon is no longer entitled to a two-point reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a).  PSR ¶¶ 35–36, 44.  Under the Plea

Agreement, these points are conditioned on Dillon "clearly demonstrat[ing] acceptance of responsibility, to the satisfaction of the Government, through [his] allocution, adherence to every provision of this Agreement, and conduct between entry of the plea and imposition of sentence." ECF No. 65 (Plea Agreement) at 3.[4]  Dillon has not lived up to that obligation.

The application notes for U.S.S.G. § 3E1.1 provides that "[i]n determining whether a defendant qualifies [for the two-point reduction for acceptance of responsibility], appropriate considerations include, but are not limited to" in relevant part:

> truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility, but the fact that a defendant's challenge is unsuccessful does not necessarily establish that it was either a false denial or frivolous[.]

U.S.S.G. § 3E1.1 App. n.1(A).[5]  "A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right." *Id.* App. n.3. Here, Dillon's lies to this Court during his plea colloquy and to the Government during his post-plea debrief were not simply limited to collateral facts—Dillon lied about the crux of his offense.  Dillon gave the frivolous

---

[4] The Agreement further provides that "[n]othing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, and/or imposition of an adjustment for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, regardless of any agreement set forth above, should your client move to withdraw your client's guilty plea after it is entered, or should it be determined by the Government that your client has either (a) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice, or (b) engaged in additional criminal conduct after signing this Agreement." *Id.*

[5] The Court may also take into account the late timing of Dillon's plea.  U.S.S.G. § 3E1.1 App. n.1(H).

explanation that he climbed into the Capitol to defend an officer from the mob (or, alternatively, in his post-plea debrief, embedded members of Antifa).  In other words, Dillon denied his own criminal culpability.

Dillon's flimsy justification collapses under the mountain of video evidence conclusively showing that Dillon was an enthusiastic participant of the mob at the Senate Wing Door—watching as rioters assaulted officers, and only then climbing inside and joining chants, including (per Dillon) for Congress to "Do [its] job!"  And it is completely inconsistent with his own admissions in the Statement of Offense—that he saw "other members of the mob forcibly open the Senate Wing Door," that he "was aware that rioters had overcome the officers by force," and then joined in the mob's chants.  SOO ¶¶ 13–17.  The Government does not seek this remedy lightly, but it must call a spade a spade:  Dillon's manufactured justification is not the stuff of acceptance of responsibility.  This Court should deny the two-point reduction under U.S.S.G. § 3E1.1.[6]

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.   While the Government concedes that Section 4C1.1 applies to Dillon, the Court should sentence Dillon higher within the Guidelines or vary upward to counteract the reduction under 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did

---

[6] The Government is not seeking to apply the U.S.S.G. § 3C1.1 enhancement for obstruction of justice to these post-plea statements or to Dillon's false statement to this Court under oath.  *But see United States v. Alford*, 23-3023 (D.C. Cir. Jan. 5, 2024) (affirming two-point enhancement under U.S.S.G. § 3C1.1 where defendant's trial testimony fell short of "deliberate falsehoods," but was nonetheless "disingenuous," "not . . . entirely candid" or "truthful," and "mischaracterized some of [his] actions and motivations" in order to downplay his culpability).

irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g.*, *United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the Court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions."). Thus, the defendant's conduct caused a significant disruption to a vital governmental function, warranting an upward variance.

Moreover, the Sentencing Commission enacted Section 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010.   Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6.  This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same sentiments that motivated the attack.  *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

The U.S. Probation Office calculated Dillon's criminal history as a Category I.  PSR ¶ 49. The U.S. Probation Office correctly calculated Dillon's total adjusted offense level at 4, without acceptance, and his corresponding Guidelines imprisonment range at zero to six months.  PSR ¶ 98.  Dillon's plea agreement contains an agreed-upon Guidelines' calculation that is nearly identical to the U.S. Probation Office's, except that it includes the two-point reduction for acceptance of responsibility.  Were the Court to disagree with Probation and the Government and find that § 3E1.1 applied, Dillon's total offense level would be 2, resulting in an identical Guidelines imprisonment range of zero to six months.  Under either Guideline calculation, the Court should impose a higher sentence within the Guidelines or vary upward to counteract U.S.S.G. § 4C1.1.

Here, while the Court must consider the Section 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, as described below, the Section 3553(a) factors weigh in favor of three months' incarceration followed by one year supervised release.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds

of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Dillon's participation in that attack, this Court should consider various aggravating and mitigating factors to fashion a just sentence. Notably, for a misdemeanor defendant like Dillon, the absence of violent or destructive acts is not a mitigating factor. Had Dillon engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in this case is that Dillon climbed through a broken window into the Capitol building after he saw the mob assault officers and overrun the Senate Wing Door by force. Dillon ignored all the warning signs—that he had to climb through the scaffolding to get to the Upper West Terrace, or that he saw a rioter climbing the Capitol Building itself—and headed straight towards the tear gas being deployed at the Senate Wing Door. Dillon stood on the front line at the broken window for almost fifteen minutes, alternating between trying to talk to officers inside and standing to one side, all while an alarm blared. Dillon watched the chaos unfold steps away from him—the mob breaching the barricaded door at 2:42 p.m. and finally assaulting and overcoming the officers at 2:47 p.m. (the second breach of the door that day). By the time Dillon finally climbed through the window at 2:50 p.m., there was little doubt why he was there—to support the mob. That is why Dillon chanted, "Do your job"—he was there to urge Congress to overturn the certification of the election and the peaceful transition of power.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of three months of incarceration this matter.

**B.  Dillon's History and Characteristics**

Dillon is 69 years old and walked with a cane for parts of his trip to D.C.  But Dillon's age or physical limitations did not stop him from climbing through a smashed-out window during the riot.  Dillon has no criminal convictions, though he does have a decades-old arrest.  PSR ¶ 53.

**C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").    Dillon's conduct during the course of this case underscores his lack of respect for the law—he lied to this Court under oath about the "only reason" he went into the Capitol and doubled down on those lies to the government during his debrief, and declined to identify his companion (in violation of his plea agreement) in order to shield the friend from criminal liability.  An incarceratory sentence is necessary to instill respect for the rule of law.

**D.  The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### 1.  General Deterrence

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." *United States v. Thomas Gallagher*, 1:21-CR-00041 (CJN) (Statement of Judge Nichols at sentencing) Tr. 10/13/2021 at 37.

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

### 2.  Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First and foremost, Dillon's lack of remorse for his conduct is galling.  Even though he admitted to being at the Capitol during his initial interview, Dillon claimed to have not done anything wrong.  He did not take a plea until weeks before his trial, and then, at his plea allocution, he equivocated on his guilt and spun a story of his gallant intent. Plea Hrg. Tr. 13-14 (Dec. 19, 2023); *cf. United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.").  And during his post-trial debrief, Dillon told lie after lie

about his conduct, apparently believing that he would not be held accountable for his statements. Dillon lied about whether he carried a flag; Dillon lied about whether he saw violence against police; and Dillon again egregiously lied about the reason he went into the Capitol Building. Dillon also declined to identify his companion in order to shield him from criminal liability, violating his agreement to debrief about the events of January 6.   This Court should view with skepticism any late-breaking remorse that Dillon may now show—only jail time will specifically deter him.

On January 6, 2021, Dillon—who walked with a cane and who had no business being there—traveled far and went to great lengths in order to tell Congress to "do [their] jobs."  With the 2024 presidential election approaching, a rematch on the horizon, and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. The Court must sentence Dillon in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[7] This Court must sentence Dillon based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

---

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Dillon has pleaded guilty to Count One of the Information, charging him with Entering and Remaining a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Defendant Benjamin Larocca, with his co-defendant, entered the Capitol through the Parliamentarian door, where they recorded chants and spent about 13 minutes inside the Capitol. 21-cr-317 (TSC).  Larocca recorded a confrontation with police by the North Door after they left the Building, and subsequently promoted his conduct on social media.  Larocca pleaded guilty to one count of 18 U.S.C. § 1752(a)(2), and this Court sentenced him to 60 days incarceration, one year supervised release, 60 hours community service, a $2,000 fine, and $500 restitution.  A higher offense level (eight) attached to Larocca's conviction and Larocca spent slightly more time than Dillon inside the Building.  However, Dillon's false statements in connection with his plea and debrief—including a manufactured justification for his conduct—as well as his utter lack of remorse, indicate that a sentence at least as severe is appropriate.

Proud Boy Jeffery Finley remained on Capitol Grounds for almost two hours, watched law enforcement attempt to repel rioters, and encouraged others to enter and remain inside the Capitol,

as he did for 8 minutes (around the same time and place as Dillon).  21-cr-526 (TSC).  After January 6, Finley deleted social media, photographs, and videos of himself.  Finley pleaded guilty to one count of 18 U.S.C. § 1752(a)(1), and this Court sentenced him to 75 days' incarceration, one year supervised release, 60 hours community service, and $500 restitution.  While Dillon's group played a far less significant role than the Proud Boys that day, like Finley, he sought to stymie the investigation, by covering for his companion despite agreeing to truthfully debrief.  Dillon's brazen lies about his conduct—including the fabrication of his protecting officers— evidence his lack of respect for the law and justify an equally significant sentence.

Recently, this Court sentenced Dennis Adams on one count of 18 U.S.C. § 1752(a)(1).  23-cr-396 (TSC).  Adams entered the Capitol Building twice, first through a Fire Door after witnessing that door being violently breached by rioters and then through a broken window by the Senate Wing Door, spending about 20 minutes in total inside.  Adams also remained on Capitol grounds even after witnessing violence between police and rioters. This Court sentenced Adams to 45 days incarceration followed by 12 months of supervised release, 60 hours community service, and $500 restitution.   Dillon spent less time inside.  However, unlike Dillon, Adams (1) promptly accepted responsibility for his conduct and expressed remorse, and (2) did not brazenly lie to this Court or the Government—both of which demonstrate Dillon's lack of remorse and a far greater need for specific deterrence.

In any event, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The Section 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and

may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Dillon must pay $500 in restitution, which reflects in part the

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

role Dillon played in the riot on January 6.[9] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Dillon's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 123.

---

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to three months' incarceration, 12 months' supervised release, 60 hours community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Dillon's liberty as a consequence of his behavior.

<div style="margin-left: 40%;">

Respectfully submitted,
MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ Michael L. Barclay
MICHAEL L. BARCLAY
Assistant United States Attorney
New York Bar Reg. No. 5441423
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, DC 20530
Michael.Barclay@usdoj.gov
(202) 252-7669

JOHN OXENREITER
New York Bar Reg. No. 5511597
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, DC 20530
John.Oxenreiter@usdoj.gov
(202) 252-7228

</div>